1   F. Richard Ruderman (SB No. 142226)
    Christian M. Knox (SB No. 171780)
2   Ruderman & Knox, LLP
    1300 National Drive, Suite 120
3   Sacramento, CA 95834
    Telephone: (916) 563-0100
4   Facsimile: (916) 563-0114

5   Attorneys for Plaintiffs

*FILED*

13 MAR -4 PM 12: 10

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

LODGED
CLERK, U.S. DISTRICT COURT

FEB 28 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10  M.C., by and through his guardian ad litem,    )   CASE NO: **CV 13-01452**
    M.N; and M.N., Parent,                          )
11                                                   )
                        Plaintiffs,                  )   **COMPLAINT FOR RELIEF**
12                                                   )   **UNDER THE INDIVIDUALS**
                                                     )   **WITH DISABILITIES**
13  vs.                                              )   **EDUCATION ACT**
                                                     )   (20 U.S.C. § 1400 et seq.)
14  ANTELOPE VALLEY UNION HIGH                       )
    SCHOOL DISTRICT,                                 )
15                                                   )
                        Defendants.                  )
16  _____             )

17                              JURISDICTION

18  1.    This Court has jurisdiction over this complaint pursuant to 20 U.S.C. § 1415(i)(3).

19

20                                VENUE

21  2.    Venue is proper in this Court under 28 U.S.C. § 1391(b).

22  3.    All of the events that are at issue in this dispute took place within the Central District of

23        California.

24  4.    Plaintiffs reside within the Central District of California.

25  5.    Defendant Antelope Valley Union High School District is a public entity located within the

26        Central District of California.

27  ///

28  ///

Complaint Under Individuals With Disabilities Education Act (20 U.S.C. § 1400 et seq.)                    Page 1

## PARTIES

6.      Plaintiff M.C. (hereinafter "Student"), is eligible for special education services under the qualifying condition of multiple disabilities and visual impairment and is entitled to the legal rights and remedies set forth in the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 *et seq.*

7.      Plaintiff M.N. is the mother of M.C., a student with a disability. Plaintiff M.N. is entitled to the legal rights and remedies set forth in the IDEA. 20 U.S.C. § 1400 *et seq.*

8.      Plaintiffs reside in Palmdale, California, within the boundaries of Defendant Antelope Valley Union High School District.

9.      Defendant Antelope Valley Union High School District is a public education agency organized and existing under the laws of the State of California (hereinafter "the District").

## BASIS OF THE DISPUTE

10.     Under the Individuals with Disabilities Education Act ("IDEA"), the parents of a student with a disability may request a state-level administrative hearing to challenge the appropriateness of the special education services provided by a local educational agency. 20 U.S.C. § 1415(b) & (f).

11.     On August 14, 2012, Plaintiffs filed a Due Process Complaint with the Office of Administrative Hearings (OAH) alleging that the District had procedurally and substantively denied Student a FAPE for the 2012-2013 school year. A copy of the Due Process Complaint is attached hereto as Exhibit "1."

12.     The District failed to file a response to Plaintiffs' Due Process Complaint as required under federal law. 20 U.S.C. § 1415(c)(2)(B)(i).

13.     On October 9, 24, and 25, 2012, this matter proceeded to hearing on Plaintiffs' Due Process Complaint before Adrienne L. Krikorian, Administrative Law Judge (ALJ) with the Office of Administrative Hearings.

14.     On November 27, 2012, the ALJ issued a written decision (hereafter "Decision"). A complete copy of the Decision is attached to this complaint as Exhibit "2" and incorporated herein by

1   reference.

2   15.   The ALJ improperly conducted the state-level administrative hearing, ignored relevant evidence,

3         misstated evidence in her Decision, and misapplied the law.  Therefore, the ALJ's Decision

4         should not be given any deference.

5   16.   Plaintiffs appeal the ALJ's Decision and seek a trial *de novo*.

6   17.   Plaintiffs seek reversal of the ALJ's Decision in its entirety.

7   18.   Plaintiffs seek findings by this Court that Student was substantively and procedurally denied a

8         free appropriate public education for the 2012-2013 school year.

9   19.   Plaintiffs seek an order requiring:

10        a.   the District convene an IEP team meeting and develop goals in all areas of need;

11        b.   the District clearly identify the assistive technology equipment, software and devices

12             Student requires in the IEP and the District be ordered to provide Student with an

13             embosser, talking compass, and talking watch;

14        c.   the District provide Student with six hours per week of vision services and one hour per

15             week of orientation and mobility services, and clearly document the services in the IEP;

16        d.   the District provide Student with a structure social skills program specifically tailored to

17             meet his needs as a blind student;

18        e.   the District be required to fund Student's counsel's attendance at all IEP team meetings

19             conducted during the 2012-2013 and the 2013-2014 school years;

20        f.   the District be ordered to provide Student with 14.25 hours of compensatory education

21             in the expanded core curriculum; and

22        g.   the District be ordered to hire a qualified teacher of the visually impaired and a trained

23             one-to-one aide and District make a referral to the California School for the Blind for

24             onsite training of staff and development of Daily Activity Schedules.

25   20.   Plaintiffs seek reimbursement for all legal fees incurred in connection with the underlying

26         administrative hearing and this action.

27   21.   Plaintiffs have exhausted their administrative remedies.

28

## FACTUAL ALLEGATIONS

22. Student's birth date is October 5, 1997.

23. Student has been diagnosed with Norrie Disease which has rendered him blind. In addition, Student has global developmental delays. Student has deficits in speech and language, fine and gross motor skills, vision, orientation and mobility, social skills, and all academic areas. Student also has significant deficits in adaptive skills, Braille, and Nemeth code.

24. In May 2012, Marquis was assessed by Dr. Robert Patterson, which was an independent educational evaluation funded by the elementary school district. Dr. Patterson found that Marquis had relative strength in oral vocabulary. However, Marquis had global deficits in all other areas of functioning.

25. Dr. Patterson recommended that Marquis be taught chunking strategies and memory strategies including mneumonics and re-auditorization which would be taught by the school psychologist. Dr. Patterson also recommended that Marquis be provided with the following accommodations: keeping oral directions short and simple, asking the student to paraphrase the directions to ensure understanding, provide kinesthetic cues for the steps to be followed, access to Recordings for the Blind, and an appropriate audio player.

26. Dr. Patterson also recommended that staff working with Marquis be provided with instruction from a mobility trainer, occupational therapy, physical therapy, a social skills group, and small group speech and language therapy.

27. In June 2012, Marquis was assessed by Sonja Biggs, a teacher of the visually impaired, which was an independent educational evaluation funded by the elementary school district.

28. Ms. Biggs recommended that Marquis be provided with one hour per day of Braille instruction, one hour per week of orientation and mobility services, and one hour per week of TVI services to address independent living skills and access to the expanded core curriculum.

29. In addition, Ms. Biggs recommended that Marquis receive Braille books, curriculum for using JAWS, a laptop computer, screen reading software, a talking watch, a cellular phone, abacus, talking calculator, Duxbury software, OCR software, scanner, embosser, and printer.

///

30.    Ms. Biggs also recommended that Marquis be provided with an aide trained in Braille throughout his school day and that he receive textbooks and all instructional materials in Braille and electronic format or audio format. Ms. Biggs also recommended that Marquis' work should be interlined, that he should be taught organizational skills and daily activities using Daily Activity Routines implemented at home and school, that he should be given extended time, real objects/models for learning, accommodations for State testing, a hearing evaluation with an audiologist and a Deaf and Hard of Hearing Specialist, and a safety plan to address his needs during school emergencies/safety drills.

31.    Ms. Biggs also recommended a referral to an agency such as California School for the Blind for assistance in training and program oversight.

32.    On August 2, 2012, the District convened an IEP team meeting.  The District indicated that Marquis did not require assistive technology or services.  This is completely inaccurate.  As indicated above, Ms. Biggs made recommendations for numerous items of assistive technology. Marquis' mother had no way of knowing what Marquis will or will not be provided from Ms. Biggs' recommendations.

33.    The August 2, 2012 IEP offered Marquis 240 minutes per month of specialized vision services and thirty minutes per week of orientation and mobility services.

34.    The District failed to provide Marquis with the recommended level of orientation and mobility training, Braille instruction, and teacher of the visually impaired (TVI) services.

35.    The District failed to provide Marquis with an adequately trained aide at the beginning of the school year.

36.    The District failed to provide Marquis with access to the expanded core curriculum and failed to develop goals in this area, specifically as it related to daily living skills, social skills, and community based orientation and mobility.

37.    The District failed to provide a referral to the California School for the Blind for training, assessment and program supervision/implementation as recommended by Ms. Biggs.

38.    It was also recommended by Ms. Biggs that Marquis receive orientation and mobility services prior to the beginning of the school year as transition services from middle school to high school.

1    The District failed to provide Marquis with such services.

2    39.   Furthermore, the orientation and mobility and TVI services provided are not adequate because

3    they do not address the expanded core curriculum or Marquis' access to the community.

4    40.   The District has failed to offer Marquis a social skills program as recommended by both Dr.

5    Patterson and Ms. Biggs.

6

7    FIRST CLAIM FOR RELIEF

8    DENIAL OF A FREE APPROPRIATE PUBLIC EDUCATION

9    DURING THE 2012-2013 SCHOOL YEAR

10   41.   Plaintiffs incorporate by reference above paragraphs 1 through 40 of this Complaint.

11   *A. The District Failed to Establish and Maintain Procedural Safeguards*

12   42.   Under the IDEA, a local educational agency must establish and maintain procedural

13   safeguards to ensure that children with disabilities and their parents are guaranteed procedural

14   safeguards.  (20 U.S.C. § 1415(a).)

15   43.   The District failed to file a response to Plaintiffs' Due Process Complaint as required under

16   federal law.  20 U.S.C. § 1415(c)(2)(B)(i).

17   44.   The District failed to provide a clear offer of services.  The August 2, 2012 IEP indicated that

18   M.N. would be provided with 240 minutes per month of TVI service.

19   45.   On the first day of hearing, the District presented Student with an Addendum to the August 2,

20   2012 IEP dated September 17, 2012.  The Addendum indicated that the District was offering

21   M.N. 240 minutes per week.

22   46.   Plaintiffs were not provided with a copy of the Addendum prior to the first day of hearing.

23   47.   At the hearing, the District asserted it was providing M.N. with five hours per week of TVI

24   services.

25   48.   The District failed to file a response to Plaintiffs' Due Process Complaint as required under

26   federal law.  20 U.S.C. § 1415(c)(2)(B)(i).

27   49.   The District failed to provide evidence five days before the hearing in this matter

28   commenced.  California Education Code Section 56501.

50.   Plaintiffs therefore seek a judicial order requiring the District be required to fund Student's counsel's attendance at all IEP team meetings conducted during the 2012-2013 and the 2013-2014 school years.

51.   Plaintiffs also seek compensatory education for the TVI services it failed to provide M.N.

*B. The District Failed to Develop Goals in all Areas of Need*

52.   Under the IDEA, a local educational agency (LEA) must develop an individualized educational program (IEP). (20 U.S.C. § 1414(d)(3).)

53.   The IEP must include present levels of academic achievement and functional performance; measurable annual goals; a description of the student's progress toward meeting the annual goals; a statement of the special education and related services and supplementary aids and services the LEA will provide the student; whether the student will participate in regular class and activities; what accommodation are necessary for the student; and the projected beginning date for services and modifications. (20 U.S.C. § 1414(d)(1)(i)(I)-(VII).)

54.   The District is an LEA. (20 U.S.C. § 1401(19); Cal. Ed. Code § 56026.2.)

55.   On August 2, 2012, the District convened an IEP team meeting.

56.   For each area that a special education student has an identified area of need, the IEP team must develop measurable annual goals. (Cal. Ed. Code § 56345.)

57.   Ms. Sonja Biggs has a masters degree in school counseling and guidance, is completing her doctoral degree in education, and is a teacher of the visually impaired with nine years of experience.

58.   At the due process hearing, Ms. Biggs testified that M.C. required goals in the areas of life skills, business travel, and residential travel.

59.   At the August 2, 2012 IEP, the District did not develop new goals for M.C.

60.   At the August 2, 2012 IEP, the District claimed that it was unable to provide M.C. new goals until the District staff had a chance to work with M.C.

61.   The District staff that worked with M.C. included Ms. Knitter and Mr. Lund.

62.   Prior to working with M.C., Ms. Knitter was not a credentialed teacher of the visually

1   impaired.  Ms. Knitter had worked with M.C. for a year.

2   63.   Mr. Lund had worked with M.C. during the 2011-2012 school year.

3   64.   The District failed to develop goals for M.C. in all areas of need.

4   65.   Plaintiffs therefore seek a judicial order requiring the District develop goals for M.C. in the

5         areas of life skills, social skills, business travel, and residential travel.

6      *C. The District Failed to Clearly Identify in Student's IEP and Provide Assistive Technology*

7   66.   Assistive technology device is any item, piece of equipment, or product system, whether

8         acquired commercially off the shelf, modified, or customized, that is used to increase,

9         maintain, or improve functional capabilities of a child with a disability.  (20 U.S.C. §

10         1401(1).)

11   67.   Under the IDEA, the IEP must document "whether the child needs assistive technology

12         devices and services."  (20 U.S.C. § 1414(d)(3).)

13   68.   The local educational agency is responsible for providing other specialized equipment for use

14         at school that is needed to implement the individualized education program.  (Cal. Ed. Code

15         § 56363.1.)

16   69.   The District failed clearly identify the assistive technology equipment, software, or devices

17         M.C. required in the IEP.

18   70.   Ms. Sonja Biggs testified at hearing that M.C. required an embosser.

19   71.   Ms. Biggs testified at hearing that M.C. required a talking compass.

20   72.   Ms. Biggs testified at hearing that M.C. required a talking watch.

21   73.   Plaintiffs therefore seek a judicial order requiring the District provide Student with an

22         embosser, talking compass, and talking watch.

23   74.   Additionally, Plaintiffs therefore seek a judicial order requiring the District clearly identify

24         what assistive technology M.C. requires.

25      *D. The District Failed to Clearly Document Services in IEP*

26   75.   Under the IDEA, a statement of the special education and related services and supplementary

27         aides and services to be provided to the child ..." and "the anticipated frequency, location, and

28         duration of those services and modifications."  (20 U.S.C. § 1414(d)(1)(A)(iii) and (iv); *see*

1    *also* Cal. Ed. Code § 56345(a)(6-7).)

2  76.   The local education agency is responsible for a Student's education and has a duty to make a
3        clear IEP offer. (See Union School District v. Smith (9th Cir. 1992) 15 F.3d 1519.)

4  77.   The District failed to clearly document which services it was providing to M.C., including the
5        frequency and duration of which the services were being delivered.

6  78.   M.C.'s August 2, 2012 IEP documents that he was to receive 240 minutes per month of
7        vision services and 30 minutes per week of orientation and mobility services.

8  79.   At the hearing, the District provided evidence of a September 17, 2012 IEP Amendment.

9  80.   The September 17, 2012 IEP Amendment offered M.C. 240 minutes (four hours) per week of
10       vision services.

11 81.   M.N. did not receive a copy of the September 17, 2012 IEP Amendment until the first day of
12       hearing.

13 82.   The District failed to provide a response to M.C. and M.N.'s due process complaint.

14 83.   Plaintiffs M.C. and M.N. had no reason to know that the District had offered M.C. additional
15       services because the District failed to respond.

16 84.   Ms. Kristen Knitter is an employee of the District. Ms. Knitter is M.C.'s teacher of the
17       visually impaired.

18 85.   Ms. Kathleen Astourian is an employee of the District. Ms. Astorian is M.C.'s program
19       specialist for M.C.'s IEP.

20 86.   At the hearing, Ms. Knitter and Ms. Astourian testified that Student was to be provided with
21       five hours per week of vision services.

22 87.   The August 2, 2012 IEP document does not match the testimony of the District employees.

23 88.   The September 17, 2012 IEP Amendment document does not match the testimony of the
24       District employees.

25 89.   The District did not clearly document what services it was providing to M.C.

26 90.   Plaintiffs therefore seek a judicial order requiring the District clearly document what services
27       it is providing to M.C.

28 ///

*E. The District Failed to Provide a Structured Social Skills Program*

91.    Ms. Sonja Biggs observed M.C. in his educational setting. Ms. Biggs reported that there was a lack of social interaction between M.C. and his peers.

92.    In her report, Ms. Biggs recommended that the District provide M.C. with social skills program.

93.    Dr. Bob Patterson testified at the hearing that M.C. was isolated an did not interact with his peers.

94.    Plaintiffs therefore seek a judicial order requiring the District to provide M.C. with a structured skills program.

*F. The District Failed to Instruct Student in the Expanded Core Curriculum*

95.    The California Department of Education (CDE) has established guidelines for providing students with visual impairments, including blind students with educational services (*Policy Guidelines for Educating Blind and Visually Impaired Students*, Office of Special Education Programs, 23 IDELR 377 (1995).)

96.    The expanded core curriculum identifies nine areas that a blind student must be educated in: compensatory skills, orientation and mobility, social interaction skills, independent living skills and personal management, recreation and leisure, career and vocational education, assistive technology, visual efficiency skills, and self determination.

97.    M.C. has not received instruction in the expanded core curriculum.

98.    M.C. required the expanded core curriculum to receive a free appropriate public education.

99.    Because the District failed to provide M.C. a free appropriate public education, he is entitled to compensatory education.

100.    Compensatory education is a form of equitable relief that is a proper remedy under the Individuals with Disabilities Education Act to preserve a disabled child's right to a free and appropriate public education.  (Murphy v. Timberland Regional School District (1st Cir. 1992) 973 F.2d 13, 16;  Burr v. Ambach (2nd Cir. 1988) 863 F.2d 1071;  Lester H. v. Gilhool (3rd Cir. 1990) 916 F.2d 865; Miener v. State of Missouri (8th Cir. 1986) 800 F.2d 749; Robert D. v. Andrews (11th Cir. 1991) 933 F.2d 1576.)

101.   Plaintiffs therefore seek a judicial order requiring the District to provide Student with 14.25 hours of compensatory education in the expanded core curriculum.

102.   The ALJ completely ignored the evidence that the District failed to provide Student with five hours per week of specialized vision services.

### G. The District Failed to Provide Qualified and Fully Trained Staff

103.   Under the IDEA, the District must "provide for instruction in Braille and the use of Braille" for a student who is blind or visually impaired.  (20 U.S.C. § 1414(d)(3)(B)(iii).)  LEAs shall take measurable steps to recruit, hire, train, and retain highly qualified personnel to provide special education.  (Cal. Ed. Code  § 56070(b).)

104.   M.C. is a visually impaired student.

105.   M.C. requires instruction in Braille.

106.   Mr. Sanchez is the District aide assigned to M.C.

107.   Mr. Sanchez is not trained in Braille.

108.   Mr. Paul Lund is the District orientation and mobility teacher.

109.   Mr. Lund has taught M.C. for approximately four years.

110.   Mr. Lund provided M.C. with a cane that was eighteen inches too short.

111.   Ms. Knitter is M.C.'s teacher of the visually impaired (TVI).

112.   At hearing, Ms. Knitter testified she had a caseload of twenty students.

113.   At hearing, Ms. Knitter testified that according to California Department of Education guideline, a TVI should have a caseload of eight to fifteen students.

114.   Ms. Knitter's caseload exceeded CDE guidelines.

115.   Neither Mr. Lund nor Ms. Knitter had adequately assessed M.C.

116.   Plaintiffs therefore seek a judicial order requiring the District be ordered to hire a qualified teacher of the visually impaired and a trained one-to-one aide. Additionally, Plaintiffs seek a judicial order requiring the District make a referral to the California School for the Blind for onsite training of staff and development of Daily Activity Schedules

117.   The District has denied M.C. a free appropriate public education during the 2012-2013 school year.

118.   Plaintiffs seek a judicial declaration or finding that the ALJ failed to consider relevant evidence, misapplied the law, that her decision should not be given any deference and should be overturned in its entirety.

## SECOND CLAIM FOR RELIEF

## LEGAL FEES

119.   Plaintiffs incorporate by reference above paragraphs 1 through 110 of this Complaint.

120.   Under 20 U.S.C. § 1415(i)(3)(B), this Court may award reasonable attorneys' fees to a prevailing party who is the parent of a student with a disability.

121.   Plaintiffs seeks a finding by this Court that Plaintiffs are the prevailing party in this case.  As such, Plaintiffs are entitled to payment of their reasonable attorneys' fees from the District for the fees related to the underlying administrative hearing and this court claim.

122.   Plaintiffs seek a finding that they are entitled to reimbursement of their reasonable legal fees in an amount to determined by this Court.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

1.   That the Court overrule the ALJ's Decision in its entirety;

2.   That the Court order the District to convene an IEP team meeting and develop goals in all areas of need.

3.   That the Court order the District to clearly identify the assistive technology equipment, software and devices Student requires in the IEP and the District be ordered to provide Student with an embosser, talking compass, and talking watch.

4.   That the Court order the District to provide Student with six hours per week of vision services and one hour per week of orientation and mobility services, and clearly document the services in the IEP.

5.   That the Court order the District to provide Student with a structure social skills program specifically tailored to meet his needs as a blind student.

Complaint Under Individuals With Disabilities Education Act (20 U.S.C. § 1400 et seq.)

6.     That the Court order the District to fund Student's counsel's attendance at all IEP team meetings conducted during the 2012-2013 and the 2013-2014 school years.

7.     That the Court order the District to provide Student with 14.25 hours of compensatory education in the expanded core curriculum.

8.     That the Court order the District to hire a qualified teacher of the visually impaired and a trained one-to-one aide and District make a referral to the California School for the Blind for onsite training of staff and development of Daily Activity Schedules.

9.     That the Court order payment for all attorneys' fees and costs in connection with this complaint (the amount continues to accrue and is subject to proof following trial herein) and the underlying administrative hearing.

10.    For such other relief as this Court may deem just and proper.


Dated: February 22, 2013

                                        RUDERMAN & KNOX, LLP


                                        CHRISTIAN M. KNOX
                                        Attorney for Plaintiff

# Exhibit 1

F. Richard Ruderman
Christian M. Knox
Colleen A. Snyder
Amber C. Lance

# RUDERMAN & KNOX LLP
### ATTORNEYS AT LAW

rick@rudermanknox.com
christian@rudermanknox.com
colleen@rudermanknox.com
amber@rudermanknox.com

**VIA FACSIMILE**

August 14, 2012

Office of Administrative Hearings
Special Education Division
2349 Gateways Oaks Drive, Suite 200
Sacramento, CA 95833-4231

Re:    *Marquis Casson v. Antelope Valley Union High School District;*
       Case No. Unassigned

To OAH:

Enclosed is Petitioner's Special Education Due Process Complaint Notice against Antelope Valley Union High School District.

Thank you for your assistance in this matter.

Sincerely,

Brett Petersen
Legal Assistant to
Christian M. Knox

Enclosure

cc:    Mirani Nichols (w/enclosure)
       Johan Mekel (w/enclosure; via facsimile)

1    Christian M. Knox (SB No. 171780)
     Ruderman & Knox, LLP
2    1300 National Drive, Suite 120
     Sacramento, CA 95834
3    Telephone:    916-563-0100
     Facsimile:    916-563-0114
4

5    Attorney for Student

6

7              **SPECIAL EDUCATION DUE PROCESS COMPLAINT NOTICE**
                         20 U.S.C. § 1415 (b) (7) (A)
8

9    **To the ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT:**

10

11   This is to notify the District of a special education due process complaint.

12   **Student:**          Marquis Casson

13   **Date of Birth:**    October 5, 1997

14   **Grade:**            Ninth grade

15   **School:**           Eastside High School

16   **Parent:**           Mirani Nichols

17   **Address:**          5703 Evergem Avenue
                            Palmdale, CA 93552
18
     **Phone:**            (661) 492-0041
19

20

21

22

23

24

25

26

27

28

## ISSUE NO. 1

### (Denial of FAPE for the 2012-2013 School Year)

Nature of the Problem:

1.       The Antelope Valley Union High School District (the District) failed to offer Marquis a free appropriate public education (FAPE) during the 2012-2013 school year by:

     a.       failing to provide him with access to the expanded core curriculum;

     b.       failing to provide him with adequate services from a qualified teacher of the visually impaired (TVI);

     c.       failing to offer him adequate orientation and mobility services;

     d.       failing to provide him with adequate training in Braille and Nemeth Code;

     e.       failing to provide him with measurable goals in all areas of need;

     f.       failing to provide a structured social skills program;

     g.       failing to provide an adequately trained one-to-one aide;

     h.       failing to provide adequate program supervision/training by a qualified person/agency to work with the visually impaired;

     i.       failing to provide an adequate transition plan to the high school campus;

     j.       failing to provide a safety plan;

     k.       failing to provide adequate assistive technology; and

     l.       failing to provide an aide on the bus.

2.       The District failed to adequately assess Marquis in the following areas:

     a.       hearing, including the need for deaf and hard of hearing services; and

     b.       physical therapy.

3.       The District procedurally denied Marquis a FAPE during the 2012-2013 school year by:

     a.       failing to document his assistive technology needs on his IEP.

Fact Pertaining to the Problem:

1.    Marquis is fourteen years old and will be in the ninth grade for the 2012-2013 school year. Marquis is eligible for special education services under the qualifying condition of multiple disabilities and visual impairment. Marquis has been diagnosed with Norrie Disease which has rendered him blind. In addition, Marquis has global developmental delays. Marquis has deficits in speech and language, fine and gross motor skills, vision, orientation and mobility, and all academic areas. Marquis also has significant deficits in adaptive skills, Braille, and Nemeth code.

2.    In May 2012, Marquis was assessed by Dr. Robert Patterson which was an independent educational evaluation funded by the elementary school district. Dr. Patterson found that Marquis had relative strength in oral vocabulary. However, Marquis had global deficits in all other areas of functioning.

3.    Dr. Patterson recommended that Marquis be taught chunking strategies and memory strategies including mneumonics and re-auditorization which would be taught by the school psychologist. Dr. Patterson also recommended that Marquis be provided with the following accommodations: keeping oral directions short and simple, asking the student to paraphrase the directions to ensure understanding, provide kinesthetic cues for the steps to be followed, access to Recordings for the Blind, and an appropriate audio player.

4.    Dr. Patterson also recommended that staff working with Marquis be provided with instruction from a mobility trainer, occupational therapy, physical therapy, a social skills group, and small group speech and language therapy.

5.    In June 2012, Marquis was assessed by Sonja Biggs, a teacher of the visually impaired, which was an independent educational evaluation funded by the elementary school district.

6.      Ms. Biggs recommended that Marquis be provided with one hour per day of Braille instruction, one hour per week of orientation and mobility services, and one hour per week of TVI services to address independent living skills and access to the expanded core curriculum.

7.      In addition, Ms. Biggs recommended that Marquis receive Braille books, curriculum for using JAWS, a laptop computer, screen reading software, a talking watch, a cellular phone, abacus, talking calculator, Duxbury software, OCR software, scanner, embosser, and printer.

8.      Ms. Biggs also recommended that Marquis be provided with an aide trained in Braille throughout his school day and that he receive textbooks and all instructional materials in Braille and electronic format or audio format. Ms. Biggs also recommended that Marquis' work should be interlined, that he should be taught organizational skills and daily activities using Daily Activity Routines implemented at home and school, that he should be given extended time, real objects/models for learning, accommodations for State testing, a hearing evaluation with an audiologist and a Deaf and Hard of Hearing Specialist, and a safety plan to address his needs during school emergencies/safety drills.

9.      Ms. Biggs also recommended a referral to an agency such as California School for the Blind for assistance in training and program oversight.

10.     On August 2, 2012, the District convened an IEP team meeting. The District indicated that Marquis did not require assistive technology or services. This is completely inaccurate. As indicated above, Ms. Biggs made recommendations for numerous items of assistive technology. Marquis' mother has no way of knowing what Marquis will or will not be provided from Ms. Biggs' recommendations. Since the District failed to complete

this information, it would appear that Marquis will not be provided with any assistive technology.

11.   The District failed to provide Marquis with the recommended level of orientation and mobility training, Braille instruction, and TVI services.

12.   The District failed to provide Marquis with a safety plan.

13.   The District failed to provide Marquis with an adequately trained aide.

14.   The District failed to provide Marquis with access to the expanded core curriculum and failed to develop goals in this area.

15.   The District failed to provide Marquis with physical therapy services or, in the alternative, an assessment as recommended by Dr. Patterson.

16.   The District failed to provide Marquis with a hearing assessment, including an assessment by a Deaf and Hard of Hearing Specialist as recommended by Ms. Biggs.

17.   The District failed to provide a referral to the California School for the Blind for training, assessment and program supervision/implementation as recommended by Ms. Biggs.

18.   It was also recommended by Ms. Biggs that Marquis receive orientation and mobility services prior to the beginning of the school year as transition services from middle school to high school.  The District failed to provide Marquis with such services.

///
///

19.  Furthermore, the orientation and mobility and TVI services provided are not adequate because they do not address the expanded core curriculum or Marquis' access to the community.

20.  The District has failed to offer Marquis a social skills program as recommended by both Dr. Patterson and Ms. Biggs.

21.  The District failed to offer Marquis an aide on the school bus.  Marquis requires an aide to assist in getting on and off of the bus and in case of an emergency due to his disability.

Proposed Resolution to the Problem

1.  Petitioner seeks declaratory relief that the District denied him a FAPE for the 2012-2013 school year and failed to adequately assess him in all area of suspected disability.

2.  The District shall fund independent educational evaluations in the following areas:
    a.     physical therapy; and
    b.     hearing, including an assessment by a Deaf and Hard of Hearing Specialist.

3.  Said assessments shall be conducted by individuals with knowledge and experience in assessing children with multiple disabilities, including blindness.

4.  The District shall convene an IEP team meeting to review the results of the assessment and fund the independent assessors' attendance at the IEP team meeting.

5.  At the IEP team meeting the District shall develop goals in all areas of need, including the expanded core curriculum.

///

6.   The District shall convene an IEP meeting and provide Marquis with the services recommended by Dr. Patterson and Ms. Biggs.

7.   The District shall make a referral to the California School for the Blind for training, supervision and program oversight for all staff, including the District's TIV and orientation and mobility specialist.

8.   The District shall provide Marquis with a social skills program.

9.   The District shall provide Marquis with all assistive technology recommended by Ms. Biggs and shall document the assistive technology in his IEP.

10.   The District shall provide Marquis with compensatory education in the form of orientation and mobility therapy, Braille instruction, and TVI services, including access to the expanded core curriculum.

11.   The District will provide Marquis with an aide on the school bus.

12.   The District shall provide Student with such other and further relief, which is unknown to Petitioner at this time, as deemed appropriate by the administrative law judge at the hearing on this matter.

Respectfully submitted,

Dated:   August 14, 2012

Christian M Knox (SM)
Christian M. Knox, Attorney for Petitioner

1

## PROOF OF SERVICE

2  Case:  *Marquis Casson v. Antelope Valley Union High School District;*
3  Case No. Unassigned

4       I am over the age of eighteen years and not a party to the above action.  My business address is
5  1300 National Drive, Suite 120, Sacramento, CA 95825.

6       On this date, I served a copy of the <u>Special Education Due Process Complaint Notice</u> on the
7  following person(s) via  facsimile at the fax number(s) listed below:

8      Office of Administrative Hearings
    Special Education Unit
9      2349 Gateway Oaks Drive, Suite 200
    Sacramento, CA 95833-4231
10      Facsimile (916) 376-6319

11      Johan Mekel
    Director of Special Education
12      Antelope Valley Union High School District
    44811 North Sierra Highway
13      Lancaster, CA 93534
    Facsimile (661) 949-3247
14

15       I declare under penalty of perjury under the laws of the State of California that the foregoing is
16  true and correct.  Executed on August 14, 2012, at Sacramento, California.

17

18  By: _____
19            Brett Petersen

20

21

22

23

24

25

26

27

28

F. Richard Ruderman
Christian M. Knox
Colleen A. Snyder
Amber C. Lance

# RUDERMAN & KNOX LLP
### ATTORNEYS AT LAW

rick@rudermanknox.com
christian@rudermanknox.com
colleen@rudermanknox.com
amber@rudermanknox.com

## FAX   COVER   SHEET

To:

☑ OAH                          Fax No. (916) 376-6319

☐ John Porter                  Fax No. (661) 537-6157

☐ Julie Elliott                Fax No. (661) 537-6157

☐ Howard Fulfrost              Fax No. (323) 330-6311

☐ Cindy Cottier                Fax No. (626) 351-5402

☐ Bridget Cook                 Fax No. (661) 948-5096

☐ Roger Gallizzi               Fax No. (661) 273-5137

☐ Airionna Whitaker            Fax No. (323) 330-6311

☑ Johan Mekel                  Fax No. (661) 949-3247


From:

☐ F. Richard Ruderman          ☐ Connie Ajay

☑ Christian Knox               ☐ Lindsey Mehler

☐ Colleen Snyder               ☐ Wade Lucas

☐ Amanda Knox                  ☐ Brett Petersen


Re:   *Marquis Casson v. Antelope Valley Union High School District;*
Case No. Unassigned


Date:   08/14/2012   No. of pages (including cover sheet): 10

Comments:

The information contained in this facsimile message is intended only for the personal and confidential use of the designated recipient(s) named above.  This message may be an attorney/client communication, and as such is privileged and confidential.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you have received this document in error and any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify me immediately by telephone and return the original message to me by mail.  Thank you.

1300 NATIONAL DRIVE, SUITE 120 • SACRAMENTO, CALIFORNIA 95834
TELEPHONE: (916) 563-0100 • FAX: (916) 563-0114
www.rudermanknox.com

Broadcast Report

P 1
08/14/2012 14:31
Serial No.  57BE35241
TC:  619859

| Destination | Start Time | Time | Prints | Result | Note |
|---|---|---|---|---|---|
| 3766319 | 08-14 14:26 | 00:01:54 | 010/010 | OK | |
| 16619493247 | 08-14 14:29 | 00:01:48 | 010/010 | OK | |

Note  TMR: Timer, POL: Poll, ORG: Original, FME: Frame Erase TX,
MIX: Mixed Original, CALL: Manual Communication, CSRC: CSRC, FWD: Forward, PC: PC-FAX,
BND: Bind, SP: Special Original, FCODE: F-Code, RTX: Re-Tx, RLY: Relay, MBX: Confidential,
BUL:Bulletin, SIP:SIP-Fax, IPADR:IP Address Fax, I-FAX:Internet Fax

Result  OK: Communication OK, S-OK: Stop Communication, PW-OFF: Power Switch OFF,
TEL: RX from TEL, NG: Other Error, Cont: Continue, No Ans: No Answer,
Refuse: Receipt Refused, Busy: Busy, M-Full:Memory Full,
LOVR:Receiving length Over, POVER:Receiving page Over, FIL:File Error,
DC:Decode Error, MDN:MDN Response Error, DSN:DSN Response Error.

F. Richard Ruderman
Christian M. Knox
Colleen A. Snyder
Amber C. Lance

## RUDERMAN & KNOX LLP
### ATTORNEYS AT LAW

rick@rudermanknox.com
christian@rudermanknox.com
colleen@rudermanknox.com
amber@rudermanknox.com

### FAX   COVER   SHEET

| To: | | | |
|---|---|---|---|
| ☑ | OAH | Fax No.  (916)  376-6319 |
| ☐ | John Porter | Fax No.  (661)  537-6157 |
| ☐ | Julie Elliott | Fax No.  (661)  537-6157 |
| ☐ | Howard Fulfrost | Fax No.  (323)  330-6311 |
| ☐ | Cindy Cottier | Fax No.  (626)  351-5402 |
| ☐ | Bridget Cook | Fax No.  (661)  948-5096 |
| ☐ | Roger Gallizzi | Fax No.  (661)  273-5137 |
| ☐ | Airionna Whitaker | Fax No.  (323)  330-6311 |
| ☑ | Johan Mekel | Fax No.  (661)  949-3247 |

From:
☐  F. Richard Ruderman          ☐    Connie Ajay
☑  Christian Knox               ☐    Lindsey Mehler
☐  Colleen Snyder               ☐    Wade Lucas
☐  Amanda Knox                  ☐    Brett Petersen

Re:   *Marquis Casson v. Antelope Valley Union High School District;*
Case No. Unassigned

Date:   08/14/2012   No. of pages (including cover sheet): 10

Comments:

The information contained in this facsimile message is intended only for the personal and
confidential use of the designated recipient(s) named above.  This message may be an
attorney/client communication, and as such is privileged and confidential.  If the reader
of this message is not the intended recipient, you have received this document in error and any review,
to the intended recipient, you have received this document in error and any review,
dissemination, distribution, or copying of this message is strictly prohibited.  If you
have received this communication in error, please notify me immediately by telephone and
return the original message to me by mail.  Thank you.

1300 NATIONAL DRIVE, SUITE 120 • SACRAMENTO, CALIFORNIA 95834
TELEPHONE: (916) 563-0100 • FAX: (916) 563-0114
www.rudermanknox.com

# Exhibit 2



State of California • Department of General Services • Jerry Brown, Governor

# OFFICE OF ADMINISTRATIVE HEARINGS

**General Jurisdiction Division:**

| | | | | |
|---|---|---|---|---|
| Sacramento | 2349 Gateway Oaks, Suite 200 | Sacramento, | Ca 95833 | (916) 263-0550 | (916) 263-0554 fax |
| Los Angeles | 320 W. Fourth Street, 6th Floor. Suite 630 | Los Angeles, | Ca 90013 | (213) 576-7200 | (213) 576-7244 fax |
| Oakland | 1515 Clay Street, Suite 206 | Oakland, | Ca 94612 | (510) 622-2722 | (510) 622-2743 fax |
| San Diego | 1350 Front Street, Rm. 6022 | San Diego, | Ca 92101 | (619) 525-4475 | (619) 525-4419 fax |

**Special Education Division:**

| | | | | |
|---|---|---|---|---|
| Sacramento | 2349 Gateway Oaks, Suite 200 | Sacramento, | Ca 95833 | (916) 263-0880 | (916) 376-6319 fax |
| Van Nuys | 15350 Sherman Way, Suite 300 | Van Nuys, | Ca 91406 | (818) 904-2383 | (916) 376-6319 fax |
| Laguna Hills | 23046 Avenida De La Carlota, Suite 750 | Laguna Hills, | Ca 92653 | (949) 598-5850 | (916) 376-6319 fax |

# FAX TRANSMITTAL INFORMATION PAGE

Date: 11/27/12                          Time: 3:05 pm

To: Christian Knox
Fax number: 563-0114

From: Dean, Tim@DGS

Subject: {Matter No.[2012080375]}{CASSON, MARQUIS}

Number of pages: 23

Attached please find the courtesy copy of the Decision issued on 11/27/2012 in the matter of Marquis Casson v. Antelope Valley Union High School District.

Tim Dean
*Decision Typist/Calendar Clerk*
*Office of Administrative Hearings*
*Phone: (916)263-0653*
*Fax: (916)263-0554*
*Special Education Fax:(916)376-6319*
*E-mail: Tim.Dean@dgs.ca.gov*

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

In the Matter of:

PARENT ON BEHALF OF STUDENT,

v.

ANTELOPE VALLEY UNION HIGH
SCHOOL DISTRICT.

OAH CASE NO. 2012080375

## DECISION

Administrative Law Judge (ALJ) Adrienne L. Krikorian, Office of Administrative
Hearings (OAH), State of California, heard this matter on October 9, 24, and 25, 2012 in
Lancaster, California.

Attorney Christian Knox represented Student.  Student's mother (Mother) attended all
days of hearing and testified.  Attorney Bridge Cook represented Antelope Valley Union
High School District (District).  Special Education Director Johan Mekel (Mr. Mekel) was
also present on all days of hearing and testified on District's behalf.

On August 14, 2012, Student filed a request for due process hearing.  On the first day
of hearing, upon joint request of the parties, the ALJ granted a continuance of the remaining
days of hearing for good cause until October 24, 2012.  At the hearing, the ALJ received
sworn testimony and documentary evidence.  At the request of the parties, the ALJ further
continued the hearing to November 15, 2012 to allow the parties time to file closing briefs.
Student timely submitted his closing brief and District filed its brief one day late[1].  The
record closed on November 16, 2012.

---

[1]    On November 16, 2012, Student filed a Motion to Strike District's closing
brief on the ground that it was filed one day late.  District filed a reply to Student's motion on
November 19, 2012.  District mistakenly understood that the due date for briefs was
November 16, 2012 instead of November 15, 2012.  Although Student argued that District
had one day to read Student's brief before filing its own closing brief, Student demonstrated
no real prejudice caused by the District's late-filed brief.  Accordingly, the Motion to Strike
is denied.  Both briefs were considered by the ALJ.

ISSUES[2]

1.      Did District deny Student a free appropriate public education (FAPE) for the 2012-2013 school year by failing to offer and provide Student appropriate related services to address all of Student's unique needs, including a qualified teacher for the visually impaired (TVI); an adequately trained one-to-one aide; supervision/training by a person/agency qualified to work with the visually impaired; appropriate orientation and mobility (O&M) services; training in braille and Nemeth Code; access to the expanded core curriculum; a structured social skills program; and a transition plan to Student's high school campus?

2.      Did District deny Student a FAPE during the 2012-2013 school year by failing to include measurable goals in all areas of need in Student's August 2, 2012 individualized education program (IEP)?

3.      Did District deny Student a FAPE during the 2012-2013 school year by failing to document Student's needs for assistive technology (AT) and by failing to offer Student AT in his August 2, 2012 IEP?

FACTUAL FINDINGS

1.      Student is 15 years old and lives with Mother within District boundaries. Student resides within the Antelope Valley Special Education Local Plan Area (SELPA), which includes District and Palmdale Elementary School District (Palmdale), where he attended Desert Willow School during the 2011-2012 school year. He currently attends the ninth grade at District's Eastside High School (Eastside). Student suffers from Norrie's Disease, the effects of which include total blindness. Student is eligible for special education

---

[2]      At the beginning of the hearing, the parties agreed to the issues set forth in this Decision. Student expressly withdrew the following issues identified in the PHC Order: whether District denied Student a FAPE by failing to offer an aide on the bus; whether District denied Student a FAPE by failing to offer Student a safety plan; and whether District failed to appropriately assess Student in the areas of hearing, including the need for deaf and hard of hearing services, and physical therapy. In Student's closing brief, Student asserted that Mother was denied the opportunity to meaningfully participate in Student's educational program because the August 2, 2012 IEP did not accurately reflect what related services Student was to receive, and because District did not accurately report to Mother after the school year started what services and at what frequency Student received services. However, issues raised for the first time in the closing brief will not be considered in this Decision because a party requesting a due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the due process complaint unless the other party agrees otherwise. (20 U.S.C. § 1415(f)(3)(B).)

under the eligibility categories of multiple disabilities and visual impairment. He reads and writes with the use of a braille writer and other technology.

*Background – December 6, 2011 IEP through June 2012*

2.     On December 6, 2011, Palmdale convened an IEP team meeting at which two District representatives, Kathryn Taylor (Ms. Taylor) and Cheryl Davis, were present for the entire meeting. The Palmdale IEP team did not complete an annual or high school transition IEP for Student. Student underwent two independent educational assessments during the spring of 2012. As part of a due process final settlement agreement (FSA) dated June 21, 2012, between Mother and Palmdale, Palmdale agreed to fund, among other services, 180 hours of compensatory TVI services to be delivered at the rate of one hour a week in the high school setting and three and one half hours a week in the home setting through the 2013 extended school year, and training for the TVI and Student's high school paraeducator at the Children's Learning Center (CLC) in Tustin, California.

*June 2012 Independent Assessments*

3.     Robert Patterson, Psy.D (Dr. Patterson) testified as to Student's psychoeducational needs. Dr. Patterson assessed Student on May 10, 2012. Dr. Patterson is a licensed psychologist, marriage, family and child counselor, and educational psychologist. He received his doctorate in psychology in 1988. His work experience includes private counseling, and public school work as a teacher, psychologist and administrator. He currently serves on the parent advisory committee of the Blind Children's Learning Center in Tustin, California, and has had experience in assessing students with visual imparities. Dr. Patterson's assessment included a battery of assessment instruments, including standardized tests, classroom observations, and parent and teacher interviews. Dr. Patterson demonstrated that he was qualified to testify as to Student's academic and psychological needs as they existed at the time of his assessments.

4.     Dr. Patterson concluded in his written report dated June 20, 2012, that Student performed significantly below average cognitively. Student also had difficulty with fine motor tasks, his ability to process what he heard was in the mild range of significant delay, he had significant strength in phonemic awareness, was in the mid-average range for sound blending, and was in the low average range for auditory closure on incomplete words. His attention capacity was significantly below average. He showed no significant hyperactivity or attention problems, and his executive processing was in the lower portion of the average range. Student was not able to complete the working memory task, demonstrating a weakness in short-term memory and working memory. His adaptive behavior was significantly delayed, and significantly below the first percentile. Student did not show any outstanding externalized behaviors, internalized behaviors, or adaptive behavioral deficits. He had some difficulty accessing appropriate skill sets, and his difficulty in neuropsychological processing and sensory motor processing impacted his learning. Student had a relative strength with phonemic awareness but not oral comprehension or retention of stories. Language was difficult for him to master. He had difficulty problem solving and

3

with sequencing of material, particularly things that involved sequencing of sensory motor actions. His social emotional functioning appeared to be an area of relative strength, but he did not appear, during observations, to have good friendships or relate to peers on a personal level.

5.     Dr. Patterson recommended strategies to assist with Student's working memory, including using chunking strategies; mnemonics and "re-auditorization"; keeping oral directions short and simple; asking Student to paraphrase directions to ensure understanding; providing kinesthetic cues for steps to be followed and task specific instructions. He also recommended registering Student for Recording for the Blind in order to reduce the time District would need to provide a braille instructor; more specific instruction from the mobility instructor geared toward Student's independent mobility skills; adding consultation in occupational therapy (OT) and physical therapy; school OT staff meetings with the Los Angeles County Regional Center provider regarding home services in functional skill development; shifting focus in school counseling to social skills, working in small groups to develop the language of social skills and reciprocal communication; and that the speech and language specialist consider small group work specific for social skills training to help him acquire skills to be more interactive with peers.

6.     Dr. Patterson did not observe Student at any District high school, and he had no knowledge of what services and supports were available to Student at Eastside. His conclusions and recommendations were based solely on his observations and testing at Palmdale, and interviews with Mother, teachers, and service providers at Palmdale.

7.     Sonja Biggs also testified to Student's needs. Ms. Biggs is completing her Ph.D. in Education. She has a master's degree in school counseling, and holds a California credential in multiple subjects. She is a certified O&M specialist and is pending certification as a specialist in visual impairments. She has taught visually impaired students since 2003. She is familiar with and teaches all components of the Expanded Core Curriculum (ECC), a supplemental curriculum for the visually impaired consisting of nine specific skill areas, which is incorporated into the California Department of Education 1997 Revised Edition of the Program Guidelines for Students Who Are Visually Impaired. The nine components are: compensatory skills, O&M, social interaction skills, independent living skills and personal management, recreation and leisure, career and vocational education, assistive technology, visual efficiency skills and self-determination (self-advocacy). Ms. Biggs demonstrated that she was qualified to testify as to Student's unique needs as a visually impaired student.

8.     Ms. Biggs assessed Student on June 13-16, 2012, while Student was at Desert Willow School. She recorded her findings and recommendations in a written report. In writing her report, she had in mind that Student would be transitioning to high school in the 2012-2013 school year. She conducted a functional vision assessment (FVA) in which she concluded that Student had no vision and therefore she could not test other aspects of Student's vision functions. She observed Student during the FVA and concluded that Student's sensory modality most used was his tactual system, with auditory being secondary. Student was a braille reader for literacy and Nemeth braille for mathematics. He could read

third grade material at an instructional level when it was presented in braille. He had some difficulty in tracking, which required additional instruction to help him overcome his difficulty. Student used a manual braille writer for written work. He scored 17/20 on a spelling test using the braille writer. He had the capacity to learn how to use technology for the blind. He relied totally on auditory input for anything audiovisual, such as a movie or video. Student demonstrated adequate cane skills, although, based upon observations during Student's work with Mr. Lund, Ms. Biggs recommended that Student should use a longer cane. Student had some difficulty with special skills, such as using a mental map for orientation. He was confused with time and distance and did not know when he had walked beyond his target destination. He had body awareness, but did not initiate trips to the restroom at school, in contrast to home. He had not yet been taught residential travel, such as traveling from the home front door to the mailbox and back. He had no experience with street intersections. He had little opportunity for developing social skills at school. He was talented at playing piano and had made remarkable progress from when he first started playing in December 2011.

9. During the hearing, Ms. Biggs offered the opinion that Student's TVI provider, Kristen Knitter (Ms. Knitter), had been doing a "remarkable job" teaching Student braille.

10. Ms. Biggs recommended that Student receive consultative and direct services from a TVI five days a week for 60 minutes a day to teach braille skills, typing skills, and technology skills for the visually impaired; a variety of AT including a laptop equipped with "NVDA" open source screen reader software, Duxbury braille translation, and optical character recognition (OCR) software; a scanner; braille embosser and printer; an abacus; a talking watch; a tactile map of the campus; O&M services once a week for 60 minutes; instruction by a TVI or other qualified instructor in independent living skills for 60 minutes a week separate from braille instruction; and an instructional aide trained in braille for the entire school day. She also recommended that Student receive all assignments, textbooks, handouts, and other written materials in braille, electronic or audio format; that he be taught organizational skills to help him keep track of his materials and assignments; that he be taught how to do activities using daily activity routines at home and school; that he learn concepts using real objects or models; that he be provided extended time for completing assignments; special accommodations for state tests and classroom tests; a hearing evaluation by a Deaf and Hard of Hearing Specialist and audiologist; and a safety plan for use during emergency drills. She also recommended that Student receive instruction in the ECC.

11. Ms. Biggs did not observe Student at any District high school, and she had no knowledge at the time of her assessment as to what services and supports were available to Student at Eastside. Her conclusions and recommendations were based solely on her observations and testing at Desert Willow School, and interviews and email correspondence with Student's teachers and service providers at Desert Willow.

*August 2, 2012 IEP and related amendments*

12.     Paul Lund (Mr. Lund) testified regarding Student's needs in O&M.  Mr. Lund taught Student O&M for approximately four years and at the time of hearing was his O&M teacher in the District.  Mr. Lund received a master of arts in special education/orientation and mobility in 1992.  He is credentialed and certified in California as a teacher and specialist in O&M.  He has been a teacher of O&M for visually impaired students since 1992, and is a member of numerous organizations related to support and education of the blind and visually impaired.  Mr. Lund demonstrated that he was qualified to testify as to Student's unique needs in relation to O&M.

13.     Ms. Knitter is a credentialed special education specialist for instruction in visual impairment and blindness.  She received her master's degree in the area of special education in 2009 and has worked for Junior Blind of America.  She has been teaching visually impaired students for Lancaster School District since 2011, and was Student's TVI in the 2011-2012 school year.  Ms. Knitter provides TVI services to schools within the SELPA via a contract with Lancaster School District.  Ms. Knitter's job duties include teaching compensatory skills such as braille, assistive technology, organizational, independent living, and social skills.  She routinely networks with other TVIs, attends conferences and continuing education seminars in her field, and has been affiliated with the California Transcribers and Educators for the Blind and Visually Impaired for two years.  She received training at CLC in early fall of 2012 pursuant to the FSA.  Ms. Knitter demonstrated that she was qualified to testify as to Student's unique needs in relation to TVI services.

14.     Mr. Mekel has a bachelor and master degree in business and special education.  He holds credentials in business, special education and administration.  He has worked for District since 1997, as a special education teacher, teacher on special assignment, program specialist and, for the past three years, director of special education.  He demonstrated that he was qualified to testify as to policies and procedures that District follows regarding special education students who transition to the District from another District.

15.     When a special education student transitions to the District without a completed IEP, the District will schedule an IEP meeting within 30 days after the start of school.  District holds IEPs only for students who have enrolled in the District.  Until it holds a transitional IEP or during the first 30 days, District bases a student's educational program, including goals and objectives, on the student's last agreed upon IEP.

16.     In Student's case, during July 2012, in preparation for Student's high school enrollment, Mother and Student, accompanied by District representatives, visited several high schools within the District and chose to enroll Student at Eastside.  District convened an IEP meeting August 2, 2012, before school started on August 13, 2012, in order to prepare staff to receive Student because District did not receive a signed high school transition IEP from Palmdale.

17.     Most District staff attended the meeting while on their summer break. Ms. Knitter attended and stayed for the entire meeting. Mr. Lund attended by telephone for approximately 10 to 15 minutes. Also attending were an adaptive physical education (APE) teacher, speech pathologist, school psychologist, general education teacher, special education teacher, school vice principal, program specialist Charae Anderson (Ms. Anderson), program specialist Kathleen Astorian (Ms. Astorian), Dr. Patterson, Ms. Biggs (by telephone), Mother, a representative of her attorney, and District's attorney Ms. Cook. Ms. Astorian facilitated the IEP meeting and co-scribed the IEP document on the web-based Special Education Information System (SEIS) with program specialist Ms. Anderson.

18.     The IEP team meeting lasted six to seven hours. Ms. Astorian presented the continuum of placement and services available to Student, including the Center for the Junior Blind. The IEP team agreed that based upon Student's ambulation and safety needs, Eastside was the most appropriate and least restrictive environment to service Student's needs including his goals and objectives for functional academics and O&M. Dr. Patterson and Ms. Biggs presented their reports and recommendations, which the IEP team discussed. The IEP team agreed that an audiology exam, as recommended by Ms. Biggs, was appropriate.

19.     The IEP team reviewed Student's present levels of performance (PLOPs) in academic achievement and functional performance. In the area of social emotional/behavior, the IEP team reported that Student got along with his peers, he showed kindness and compassion towards them, he followed all school rules and adult directions, he behaved on the bus and on the playground, he followed step by step directions, enjoyed going into the community, could feed himself and was loved by the staff at Palmdale. Mr. Lund discussed Student's PLOPs in O&M, and addressed safety concerns while ambulating on campus. The IEP team acknowledged that the paraeducator assigned full-time to Student would require training in working with the visually impaired. The IEP team discussed the issue of the length of Student's cane, and agreed with Ms. Biggs' recommendation that Student needed a longer cane. The IEP team also acknowledged that District had other staff working with visually impaired students in the District who had received training and support as appropriate for each student's needs. The IEP team also acknowledged that Student was due for an annual IEP by December 2012, and that, as Student acclimated to high school, the case manager would begin to develop new goals and activities for development of a transition plan in time for the annual review.

20.     Although Student met some of his goals from the December 12, 2011 IEP, the IEP team agreed that Student's goals and objectives from his December 12, 2011 IEP were relevant and appropriate for District staff to implement and evaluate Student's PLOPs in preparation for the December 2012 annual review or within 90 days after Student began high school. Ms. Biggs recommended that Student should have goals in daily living skills, literary braille, Nemeth braille, O&M, social skills and vocational transitional skills. Dr. Patterson recommended three O&M goals in conjunction with Mr. Lund that were incorporated into the IEP. The August 2, 2012 IEP included 20 goals in math, braille, writing, language arts, adaptive living skills, pragmatic language, O&M, social emotional, object control, and gross motor. Ms. Knitter wanted to continue working on Student's

December 2011 goals in the high school environment to better determine his needs, notwithstanding that Student had met some of those goals in middle school. Ms. Biggs and Dr. Patterson agreed that District staff needed time to get to know and informally evaluate Student in the high school environment in order to develop appropriate goals and objectives and re-evaluate services.

21.   Mother expressed concern that District staff working with Student should be skilled in working with students with visual impairments and about the amount of O&M services Student would receive.

22.   The IEP team offered Student placement at Eastside within the special day class-prevocational life skill setting for five 50-minute periods a day, and one period of mainstreaming in a general education elective such as music. District also offered: APE 30 minutes six times a week for a total of 180 minutes weekly; language and speech 30 minutes four times a month for a total of 120 minutes monthly; O&M 30 minutes weekly; TVI eight 30 minute sessions for a total of 240 minutes a month; OT 30 minutes weekly; a special circumstance paraeducator (SCP) for 100 percent of the school day; counseling and guidance 20 minutes twice a week; and extended school year. Page four of 41 of the IEP stated that Student did not require assistive technology. However, the next section stated that Student required low incidence services, equipment and/or materials to meet his educational goals. It also specified that Student required equipment and training which will assist in improving functional mobility skills, training to assist with braille and software for the visually impaired, technology and other educational materials for the visually impaired and blind, and print materials converted to braille. The IEP team printed the final version of the IEP and presented it to Mother, who signed it authorizing implementation of services, but disagreed that it offered a FAPE.

23.   At the time of Student's August 2, 2012 IEP meeting, the SEIS program developers were implementing software updates that created system errors that were unknown to District. As a result, the printed IEP document generated on August 2, 2012, contained clerical errors that were discovered after the IEP team meeting concluded.[3] The first error resulted in the checkbox for AT services being checked "no" instead of "yes." The second error was a misstatement of the number and frequency of services for TVI. Although the August 2 version of the IEP reflected eight 30-minute sessions of TVI or 240 minutes *a month*, Ms. Knitter understood and believed that the IEP team offered one hour a day, five days a week, for a total of 300 minutes *a week*, throughout the school year, consistent with Ms. Biggs' recommendations.

---

[3]   The evidence established that the August 2, 2012 offer of APE was erroneously recorded as 180 minutes weekly instead of 180 minutes monthly. The September 17, 2012 IEP amendment, discussed below, corrected the APE services to reflect 30 minutes, six times, for a total of 180 minutes a month. Student did not raise this error as an issue nor request that the ALJ make findings of fact and conclusions of law as to whether it resulted in a denial of FAPE, and therefore it was not considered by the ALJ in the analysis below.

24.    Ms. Knitter and Mr. Lund also understood and expected that District would provide Student with numerous AT devices, including a longer cane, a classroom desktop computer with braille overlays for the keyboard, a laptop computer with NVDA and Duxbury software, a USB memory stick for transport of work from home to school, a Bookport, a braille writer, Eye Pal Solo oral reader, a Nemeth decoder for work with numbers and mathematics, and a talking calculator.

25.    Ms. Knitter notified Ms. Astorian shortly after the IEP team meeting that the IEP document had errors. Ms. Astorian thereafter notified Student's case carrier at Eastside, Ms. Taylor. Ms. Taylor confirmed with Ms. Knitter that at the IEP meeting District had offered one hour a day five days a week of TVI services and AT services. Ms. Taylor also reviewed the rest of the IEP to determine whether any other clerical errors had been made. District generated two amendments to the IEP. The first amendment dated August 24, 2012, corrected the checkbox for AT services from "no" to "yes," but it did not specify what AT would be provided to Student. Mother signed the first amendment at District offices but did not agree that the AT services were a FAPE.

26.    Ms. Taylor completed the second amendment on or about September 17, 2012. The September 17, 2012 Amendments Page stated that "Student would benefit from Specialized Vision Services 240 minutes weekly" and she modified the FAPE Offer of Services page to reflect 240 minutes weekly. She discovered after she placed it in the District outgoing mailbox addressed to Student's mother that she erred in listing TVI services as eight 30 minute sessions for a total of 240 minutes weekly instead of five one hour sessions for a total of 300 minutes weekly. Mother first saw the second amendment on the first day of the due process hearing; she signed and returned the amendment to District consenting to implementation. She did not agree that the IEP as amended offered a FAPE.

*Student's Educational Program After the August 2, 2012 IEP*

27.    District assigned paraeducator Daniel Sanchez to Student full-time from the first day of school on August 13, 2012. Mr. Sanchez has been a paraeducator with District for six years. He has received training from District on working with students with health issues, including addressing seizures, CPR, first aid and emergency evacuations, and, at the time of the hearing he had attended two training sessions at CLC. Mr. Sanchez was not fluent in braille at the beginning of school but Ms. Knitter began training him in braille and on the use of Student's AT devices shortly after the first day of the 2012-2013 school year. Ms. Knitter reviewed and corrected his translations of Student's assignments into braille before they were delivered to Student's teacher. Mr. Sanchez received consultation from Ms. Knitter and Mr. Lund each time they worked with Student. He remained with Student full time during the school day except for a 30-minute lunch break, when another District staff member covered for him. Mr. Sanchez maintained a Buddy Book for Student that traveled with Student in his backpack. He recorded, in the Buddy Book, which services and activities Student received and engaged in daily so Mother could be informed of his daily routine. Student participated in classroom activities, including "watching" video movies using a

headphone for sound. Student had a safety plan that Mr. Sanchez was familiar with, and Student successfully participated in a campus fire drill with adult assistance.

28.     Mr. Lund worked with Student and Mr. Sanchez on the first day of school. He provided more than 30 minutes weekly of O&M to Student from the second week of school. Mr. Lund often spent additional time during his visits consulting with Mr. Sanchez and Ms. Gonzalez. Mr. Lund determined that he would continue to provide additional services until he was confident that Student had acclimated to his new school environment and that Mr. Sanchez was sufficiently trained to work with Student in O&M during the school day.

29.     Ms. Knitter provided Student with one hour of school-based VI services daily from the end of the first week of school, in addition to the TVI services called for in the FSA. Ms. Knitter kept separate logs of her IEP services and the FSA TVI services. She worked with a District AT provider on the first day of school to insure that the AT devices Student required were available or ordered for Student. As part of her instruction and consultation with Ms. Gonzalez and Mr. Sanchez, Ms. Knitter implemented the nine components of the ECC as she deemed appropriate for Student at that time. She worked with Mr. Sanchez regularly to teach him braille, and regularly ensured that Student's assignments were translated into braille utilizing resources readily available to Eastside.

30.     Martha Gonzalez (Ms. Gonzalez) has been employed by District as a special education teacher for students with moderate/severe disabilities in a prevocational setting since 2011. Student was assigned to her from the first day of the 2012-2013 school year. Ms. Gonzalez is a California credentialed special education teacher currently working on a master's degree in special education. She worked as a special assistant for students with moderate/severe disabilities for four years before coming to District in 2006, where she worked as a paraeducator until 2011. Mr. Lund and Ms. Knitter have trained Ms. Gonzalez on a consultative basis in O&M and on the AT devices Student used. She does not read braille or Nemeth Code. She has provided approximately 50 percent of Student's worksheets in braille; he completed other assignments using his computer. Student turned his assignments in using braille format within the week they are assigned. Student worked in pairs during math, played braille Bingo with survival words, paired with another student during English, and was exposed to typical peers during his music class, snack and lunchtime. His conversational exchanges were limited. Ms. Gonzalez began maintaining daily service logs to keep track of Student's services beginning on August 30, 2012. Student missed part of the academic lessons working on his goals when any of the five service providers pulled him out of class for services. As part of Student's curriculum, Ms. Gonzalez worked with Student on various components of the ECC, including self-advocacy, vocational skills, social skills, hygiene, sitting in a restaurant, bullying, and getting along with other students. Student participated in one community-based instruction activity at a local bowling alley, during which Mr. Sanchez, Mr. Lund, and Ms. Knitter accompanied him.

31.     Following the August 2, 2012 IEP, and in preparation for Student's annual IEP in December, Mr. Mekel contacted the California School for the Blind (CSB) to investigate

what services, assessments and supports, including staff training, were available to Student through CSB. District filled all AT requests for Student from Student's teachers or providers, including a longer cane, by the beginning of October 2012.

## LEGAL CONCLUSIONS

1.  As the petitioning party, Student has the burden of proof on all issues. (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387].)

*Issue One:  Appropriate Related Services and High School Transition Plan.*

2.  Student contends that District failed to offer the following related services in the August 2, 2012 IEP:  a) a qualified teacher for the visually impaired (TVI); b) a one-to-one aide; c) supervision/training by a person/agency qualified to work with the visual impaired; d) orientation and mobility services; e) training in braille and Nemeth Code; f) access to the expanded core curriculum; g) a structured social skills program; and h) a transition plan to Student's high school campus.  District contends the August 2, 2012 IEP offered Student a FAPE with regard to related services and supervision.

*Applicable Law*

3.  A child with a disability has the right to a FAPE under the Individuals with Disability Education Act (IDEA).  (20 U.S.C. § 1412(a)(1)(A); Ed. Code, §§ 56000, 56026.) FAPE means special education and related services that are available to the student at no cost to the parent or guardian, that meet the state educational standards, and that conform to the student's IEP. (20 U.S.C. § 1401(9); Ed. Code, § 56031; Cal. Code Regs., tit. 5, § 3001, subd. (o).) The term "related services" (in California, "designated instruction and services"), includes transportation and other developmental, corrective, and supportive services as may be required to assist a child to benefit from education. (20 U.S.C. § 1401(26); Ed. Code, § 56363, subd. (a).)

4.  At the beginning of each school year, each local educational agency (LEA) must have an IEP in effect for each child with a disability within its jurisdiction.  (34 C.F.R. § 300.323(a)(2006)[4]; Ed. Code, § 56344(c).)  The IEP consists of a detailed written statement that must be developed, reviewed, and revised for each child with a disability. (*Honig v. Doe* (1988) 484 U.S. 305, 311 [108 S.Ct. 592, 98 L.Ed.2d 686]; 20 U.S.C. §§ 1401 (14), 1414 (d)(1)(A); Ed. Code, §§ 56032, 56345.) Each school district is required to initiate and conduct meetings for the purpose of developing, reviewing, and revising the IEP of each individual with exceptional needs. (Ed. Code, § 56340.)

---

[4]     All subsequent references to the Code of Federal Regulations are to the 2006 edition.

5.      In *Board of Education of the Hendrick Hudson Central School District, et al. v. Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] (*Rowley*), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to" a child with special needs. *Rowley* expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (*Id.* at p. 200.) Instead, *Rowley* interpreted the FAPE requirement of the IDEA as being met when a child receives access to an education that is reasonably calculated to "confer some educational benefit" upon the child. (*Id.* at pp. 200, 203-204, 207; *Park v. Anaheim Union High School Dist.* (9th Cir. 2006) 464 F.3d 1025, 1031.)

6.      In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program. (See *Gregory K. v. Longview School District* (9th Cir. 1987) 811 F.2d 1307, 1314.) A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student. (*Ibid.*) For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school district's offer of educational services and/or placement must be designed to meet the student's unique needs, comport with the student's IEP, and be reasonably calculated to provide the pupil with some educational benefit in the least restrictive environment. (*Ibid.*) Whether a student was denied a FAPE is determined by looking to what was reasonable at the time, not in hindsight. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, citing *Fuhrman v. East Hanover Bd. of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.)

7.      As long as a school district provides an appropriate education, methodology is left up to the district's discretion. (*Rowley, supra,* 458 U.S. at p. 209; *Roland M. v. Concord Sch. Committee* (1st Cir. 1990) 910 F.2d 983, 992 (citing *Rowley,* 458 U.S. at p. 202).)

8.      In the case of a student who is blind or visually impaired, the IEP team shall provide for braille instruction and the use of braille unless it determines after an assessment of the student's needs that instruction or the use of braille is not appropriate for the student. (Ed. Code § 56341.1, subd. (a)(3).) A school district shall provide opportunities for braille instruction for pupils who, due to a prognosis of visual deterioration, may be expected to have a need for braille as a reading medium. (Ed. Code, § 56351.) A school district may provide braille instruction using a braille instructional aide who is fluent in reading and writing grade two braille and possesses basic knowledge of the rules of braille construction. (Ed. Code § 56351.5, subd. (a).) A teacher who holds an appropriate credential to teach pupils who are functionally blind or visually impaired shall provide braille instruction. (Ed. Code § 56352, subd. (d).)

9.      A failure to implement an IEP may deny a child a free appropriate public education and thereby give rise to a claim under the IDEA. (*Van Duyn vs. Baker Sch. Dist. 5J* (9th Cir. 2007) 502 F.3d 811, 821.) Minor implementation failures are not actionable given that "special education and related services" need only be provided "in conformity

with" the IEP. A school district is not statutorily required to maintain perfect adherence to the IEP, nor do minor implementation failures rise to the level of a denials of a FAPE. (*Ibid.*) A failure is material "when there is more than a minor discrepancy between the service a school provides to a disabled child and the service required by the child's IEP." (*Id.* at p. 822.)

10.     An IEP must include a statement of the special education and related services, based on peer-reviewed research to the extent practicable that will be provided to the student. (20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4); Ed. Code, § 56345, subd. (a)(4).) The IEP must include: a projected start date for services and modifications; and, the anticipated frequency, location and duration of services and modifications. (20 U.S.C. § 1414(d)(1)(A)(i)(VII); 34 C.F.R. § 300.320(a)(7); Ed. Code, § 56345, subd. (a)(7).) Only the information set forth in title 20 United States Code section 1414(d)(1)(A)(i) must be included in the IEP and the required information need only be set forth once. (20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.320(d); Ed. Code, § 56345, subds. (h) & (i).)

11.     An IEP team is required to include: one or both of the student's parents or their representative; a regular education teacher if a student is, or may be, participating in regular education; a special education teacher; a representative of the school district who is qualified to provide or supervise specially designed instruction, is knowledgeable about the general education curriculum and is knowledgeable about available resources; a person who can interpret the instructional implications of assessments results; at the discretion of the parties, other individuals; and when appropriate, the person with exceptional needs. (34 C.F.R. § 300.321(a); Ed. Code, §§ 56341, subd. (b), 56342.5 [parents must be part of any group that makes placement decisions].)

12.     The parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child; and the provision of FAPE to the child. (34 C.F.R. § 300.501(a) (2006); Ed. Code, § 56500.4.) A parent has meaningfully participated in the development of an IEP when he or she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover Bd. of Education, supra,*993 F.2d 1031, 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].)

13.     A denial of FAPE may only be shown if procedural violations under the IDEA impeded the child's right to FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE, or caused a deprivation of educational benefits. (Ed. Code, § 56505, subd. (f)(2); see also *W.G. v. Bd. of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

*Analysis of Issue One*

14.    First, Student did not meet his burden of establishing that District denied him a FAPE by failing to provide a qualified TVI. As discussed above, District must provide a teacher who holds the appropriate credential to teach students who are visually impaired. The evidence established that District offered TVI services in the August 2, 2012 IEP, and implemented the IEP by assigning Ms. Knitter to provide those services. Student argued in his closing brief that Ms. Knitter was not qualified and did not have enough experience to deliver TVI services, including braille instruction, to Student. However, Ms. Knitter's testimony credibly established that she had the education, credentials, training and experience, including with Student, necessary to provide Student with TVI services based upon his unique needs. Ms. Biggs testified that Ms. Knitter had done a "remarkable" job teaching Student braille during the 2011-2012 school year, which refuted Student's argument that Ms. Knitter was not qualified to teach Student braille. Ms. Biggs offered no persuasive testimony that criticized Ms. Knitter's qualifications or her delivery of TVI services to Student during the 2011-2012 school year. Mr. Sanchez and Ms. Gonzalez also credibly testified that Ms. Knitter trained Mr. Sanchez in braille from the first week of school, that she assisted in providing Student with his assignments and materials in braille, and that she provided consultation services to both of them. The evidence established that Ms. Knitter's training was sufficient to ensure that she could offer Student a meaningful educational benefit. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 14.)

15.    Student also did not meet his burden of establishing that District denied him a FAPE by failing to provide him with an "adequately trained" one-to-one aide. As discussed above, the District *may*, but is not required to, provide a "braille instruction aide" to reinforce braille instruction. Here, District implemented the August 2, 2012 IEP by providing a SCP, Mr. Sanchez. Although Mr. Sanchez testified that he had no direct experience working with students with visual impairment before August 13, 2012, he had several years' experience working as a paraeducator with Students with multiple health issues. He also credibly testified that he began working with Student on the first day of school, that he received regular consultation and training from both Mr. Lund and Ms. Knitter in working with visually impaired students, that he was learning braille, that he helped to transcribe Student's assignments into braille with Ms. Knitter's assistance, that he had a safety plan for Student, and that he was receiving additional training in working with visually impaired students and learning braille. He also credibly testified that he worked with Student daily on his goals and assignments, he kept logs of Student's activities and work in the Buddy Book, and he worked in collaboration with Student's service providers. Mr. Mekel credibly testified that District was exploring additional training options for staff through the CSB and other resources, which was reasonable based upon what the IEP team knew of Student's unique needs at the time of the August 2, 2012 IEP. Mr. Sanchez' training and experience, in conjunction with the consultation services offered by Mr. Lund and Ms. Knitter, were sufficient to ensure that Mr. Sanchez's SCP services could offer Student meaningful educational benefit. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 15.)

14

16.    Student also did not meet his burden of establishing that District denied him a FAPE because it failed to provide him with supervision/training by a person/agency qualified to work with the visually impaired. The evidence established that District implemented Student's August 2, 2012 IEP by assigning Ms. Knitter and Mr. Lund to Student, both of whom were qualified to deliver appropriate services to Student in TVI and O&M, respectively, and to train and supervise Mr. Sanchez and Ms. Gonzalez, a credentialed special education teacher, and other District staff in their work with Student. As discussed earlier, Ms. Biggs opined that Ms. Knitter had delivered "remarkable" work to Student during the 2011-2012 school year. Mr. Lund had worked with Student for the past four years, and had 20 years of experience working with the visually impaired. Both Mr. Lund and Ms. Knitter supervised Mr. Sanchez and Ms. Gonzalez in their work with Student. Mr. Lund testified that he delivered more than the amount of O&M services called for in the August 2, 2012 IEP, including consultation with Ms. Gonzalez and Mr. Sanchez, during the first months of the school year. Additionally, as discussed above, Mr. Mekel credibly testified that shortly after school started he consulted with the CSB on the availability of additional resources for training and support for Student and District staff. Because Student was new to the District, District's ongoing research into other possible resources to support Student's unique needs was reasonable and consistent with the IEP team's decision to reconvene in not more than 90 days to reevaluate goals and services. Student offered no evidence that he was denied meaningful educational benefit at the time he filed his complaint, or up to the time of hearing, because of less than appropriate supervision or training of District staff working with Student. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 16.)

17.    Student also did not meet his burden of establishing that District denied him a FAPE by failing to offer or provide him with adequate O&M services. As discussed above, the August 2, 2012 IEP offered Student 30 minutes a week of O&M services based upon Mr. Lund's recommendation. District implemented the IEP by assigning Mr. Lund, who provided services as called for in the IEP. Ms. Biggs testified that she felt Student needed additional training in skills he had not learned while in middle school and she recommended one hour a week of O&M services. However, her opinions were based only upon her observations of Student in middle school. Because Ms. Biggs was unfamiliar with the Eastside campus or its available services and supports, her testimony did not outweigh Mr. Lund's credibility given his four years of experience working with Student. Student argued in his closing brief that Mr. Lund's decision to provide additional O&M time up to the time of hearing was evidence that the IEP offer of 30 minutes weekly was insufficient. Student's argument was not persuasive nor did the evidence lead to such a conclusion. The fact that Mr. Lund elected to temporarily increase the O&M services to aid Student during the first few months of his transition to high school did not support a finding that the August 2, 2012 IEP offer was inappropriate, particularly because District reasonably acknowledged at the IEP meeting that it needed up to 90 days to more fully evaluate Student's needs for additional services. Student offered no evidence that he was denied a meaningful educational benefit because District failed to offer 1 hour a week of O&M services in the August 2, 2012 IEP. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 13, 15 through 17.)

15

18.     Student also did not meet his burden of establishing that District denied him a FAPE by failing to offer or provide him with training in braille and Nemeth Code. Ms. Knitter credibly testified that, based upon the AT devices ordered by Ms. Knitter and made available to Student during the first weeks of school, the IEP team contemplated that TVI services would include continued training in braille and Nemeth Code for Student to access his curriculum. Ms. Knitter, Ms. Gonzalez and Mr. Sanchez testified that Student received instruction in braille and Nemeth Code from the first day of school, and he had a braille writer and the Nemeth Code available to him during school hours. Student offered no evidence that he was deprived of a meaningful educational benefit because District did not specifically offer training in braille and Nemeth Code in the August 2, 2012 IEP. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 13, 15, 16, 18.)

19.     Student also did not meet his burden of establishing that District denied him a FAPE by failing to offer Student the ECC as part of his educational program. First, the evidence established through the credible testimony of Ms. Knitter and Ms. Biggs that the ECC is not required by the CDE but is part of a 1997 compilation of recommendations and guidelines for educators working with the visually impaired. As discussed above, as long as a District provides appropriate instruction, methodology is left to the District's discretion. (*Rowley, supra*, 458 U.S. at p. 209.) Additionally, although the August 2, 2012 IEP did not specifically state that the ECC would be part of Student's curriculum, Ms. Knitter, Mr. Lund, Mr. Sanchez and Ms. Gonzalez credibly testified that they delivered instruction in the nine modules of the ECC, as they deemed appropriate for Student based upon his needs as known to them. For example, Student received training in compensatory skills, including braille, use of computer software designed to convert print to braille or audio. Student received O&M from Mr. Lund. Ms. Gonzalez worked with student during class time on social interaction and self-advocacy skills and Student participated in community-based instruction. Mr. Lund and Mr. Sanchez worked with Student on independent living skills and personal management, including how to button his pants and use the restroom. Student received AT, and APE as part of his IEP. Student offered no credible evidence supporting a finding that Student was deprived of a meaningful benefit because District did not specify in the August 2, 2012 IEP that he would receive instruction in the ECC. (Factual Findings 1 through 31; Legal Conclusions 1, 3-13, 15, 19.)

20.     Student also did not meet his burden of establishing that District denied him a FAPE by failing to offer him a structured social skills program. First, Student offered no credible evidence that he specifically required a structured social skills program that was exclusive from components of the ECC and special education curriculum implemented by District staff on District's comprehensive high school campus. Although Ms. Biggs recommended that he engage in activities via the ECC that worked on his social skills, her opinion, while informative, was not persuasive as to Student's needs in high school because she did not observe Student at Eastside and she did not know what curriculum or services were available to Student at Eastside. On the other hand, the evidence established that the August 2, 2012 IEP team determined from a review of his PLOPs that Student got along with his peers, he showed kindness and compassion towards them, he followed all school rules and adult directions, he behaved on the bus and on the playground, he followed step by step

16

directions, enjoyed going into the community, could feed himself and was loved by the staff at Palmdale. His IEP included goals in social skills. Ms. Gonzalez and Mr. Sanchez testified that they worked with Student on social advocacy, social skills and social interaction with his peers throughout the school day in the high school environment. Student offered no evidence that he was deprived of meaningful educational benefit because District did not offer him a separate structured social skills program in the August 2, 2012 IEP. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 20.)

21.    Finally, Student did not meet his burden of establishing that District procedurally or substantively denied him a FAPE by failing to hold a "high school transition IEP." First, Student did not cite to any legal authority in his closing brief that established that District was required to have a "high school transition plan" in place for Student. On the other hand, as discussed above, the IDEA requires that a District have an IEP offer in place at the beginning of each school year. Here, the evidence established that District staff accompanied Student and Mother on a tour of District's high school campuses in July, during summer break, and then held an IEP meeting on August 2, 2012 before school started. The August 2, 2012 IEP was signed and in place before school started, establishing that District complied with its obligations under the IDEA. At the start of school, District assigned Mr. Lund and Ms. Knitter to work with Student in O&M and TVI services, both of whom provided a continuity of services to ensure a successful transition to high school. Student offered no evidence that he was deprived of any meaningful educational benefit because District did not hold a "high school transition" IEP. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 21.)

22.    In summary, Student did not meet his burden of proof as to any of the sub-parts of Issue 1.

*Issue 2: Failure to offer appropriate goals*

23.    Student next contends that District denied him a FAPE by failing to offer appropriate goals, as recommended by Dr. Patterson and Ms. Biggs, in the August 2, 2012 IEP. District contends that the goals in Student's August 2, 2012 IEP were appropriate based upon what District reasonably knew about Student's needs at the time of the IEP, and therefore the IEP offered Student a FAPE. Student failed to meet his burden by the preponderance of the evidence.

*Applicable Law*

24.    Legal Conclusions one and three through 21 are incorporated by reference.

25.    An IEP must contain a statement of measurable annual goals related to "meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum" and "meeting each of the child's other educational needs that result from the child's disability." (20 U.S.C. § 1414(d)(1)(A)(ii); Ed. Code, § 56345, subd. (a)(2).) The IEP must also contain a statement of how the child's goals

will be measured. (20 U.S.C. § 1414(d)(1)(A)(viii); Ed. Code, § 56345, subd. (a)(3).) The IEP must show a direct relationship between the present levels of performance, the goals, and the educational services to be provided. (Cal. Code Regs., tit. 5, § 3040, subd. (c).) An examination of an IEP's goals is central to the determination of whether a student has received a FAPE. In *Adams, etc. v. Oregon, supra*, 195 F.3d at p. 1149, the court stated: "[W]e look to the [IEP] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer ... a meaningful benefit."

*Analysis of Issue Two*

26.     The evidence established through the testimony of Ms. Knitter, Ms. Gonzalez, Ms. Astorian, Dr. Patterson, Ms. Biggs and Mr. Lund that the IEP team considered Student's PLOPs based upon Ms. Biggs' and Dr. Patterson's reports, and as reported by Ms. Knitter and Mr. Lund. District staff needed time to get to know Student's needs by working with him on his current goals in the high school setting, a decision with which both Dr. Patterson and Ms. Biggs concurred. Ms. Knitter credibly testified that working with Student on his December 2011 goals in the high school environment was appropriate to better determine his needs, notwithstanding that Student had met some of those goals in middle school. The IEP team reasonably concluded that District would incorporate the goals from December 2011 IEP into the August 2, 2012 IEP to allow District staff to evaluate Student's performance on the goals in the high school environment and prepare for his annual IEP in December. Ms. Biggs opined that Student should have goals in daily living skills, literary braille, Nemeth braille, O&M, social skills and vocational transitional skills, many of which were incorporated into the IEP goals. Dr. Patterson recommended three O&M goals in conjunction with Mr. Lund that the IEP team also incorporated into the IEP. Although Ms. Biggs recommended additional goals, Student offered no credible evidence to support a finding that the 20 annual goals included in the August 2, 2012 IEP in the areas of math, braille, writing, language arts, adaptive living skills, pragmatic language, O&M, social emotional, object control, and gross motor were not appropriate or were not designed to meet all of Student's unique needs as reasonably known to the IEP team on August 2, 2012. Student also offered no credible evidence supporting a finding that District denied Student a FAPE by failing to offer appropriate goals resulting in a deprivation of meaningful educational benefit. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 21, 25, 26.)

*Issue 3: Failure to offer and specifically document AT*

27.     Student contends that District procedurally violated the IDEA by failing to document his need for AT and by failing to offer Student AT in the August 2, 2012 IEP. As a result, Student contends that District deprived Mother of the opportunity for meaningful participation in the development of Student's educational program, and deprived Student of educational benefit and a FAPE. District contends that a technical error in Student's IEP relating to AT was corrected shortly after the IEP meeting, and that the error did not result in a deprivation of any meaningful educational benefit to Student during the short time between

18

the IEP meeting and the August 24, 2012 amendment. Student failed to meet his burden by the preponderance of the evidence.

*Applicable Law*

28.    Legal Conclusions one, three through 22, and 24 through 26 are incorporated by reference.

29.    The IEP team must consider whether a student requires assistive technology devices and services. If the IEP team determines that a student requires a particular device or service in order for Student to receive a FAPE, the IEP team must include a statement to that effect in the pupil's IEP. (Ed. Code § 56341.1(b)(5), (c).) An assistive technology device means any item, piece of equipment or product system that is used to increase the functional capabilities of a child with a disability. (20 U.S.C. § 1401(1); 34 C.F.R. § 300.5 (2006); Ed. Code, § 56020.5.) An assistive technology service is any service that helps a disabled child select an appropriate assistive technology device, obtain the device, or train the child to use the device. (20 U.S.C. § 1401(2); 34 C.F.R. § 300.6 (2006).)

*Analysis of Issue Three*

30.    As discussed above, an IEP must include a statement of the special education and related services, including AT, including time and frequency that will be provided to the student. Based on the credible testimony of Mr. Mekel, Ms. Astorian, Ms. Taylor, and Ms. Knitter, the software issues with SEIS caused the final printed version of the IEP developed by the August 2, 2012 IEP to have clerical errors regarding AT services by stating that Student did not require assistive technology, which was a technical procedural violation because the IEP team intended to offer and provide AT to Student. However, page four of 41 of the August 2, 2012 IEP specified that Student required low incidence services, equipment and/or materials to meet his educational goals. It also specified that Student required equipment and training to assist in improving functional mobility skills, training to assist with braille and software for the visually impaired, technology and other educational materials for the visually impaired and blind, and print materials converted to braille. District partially corrected the clerical error by changing the check box from "no" to "yes" in the August 17, 2012 amendment. District did not add a specific list of the AT devices that it offered to Student, which was called for on the Special Factors page in parenthesis by the word "specify" following the word "yes." Nevertheless, the August 2, 2012 IEP as amended on August 24, 2012 substantially complied with the IDEA. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 22, 24 through 26, 28 through 30.)

31.    Regarding the time period between August 2, 2012 and August 24, 2012, Student did not offer any credible evidence that, prior to the August 24, 2012 IEP amendment, the clerical error in the IEP relating to AT denied Mother the opportunity to meaningfully participate in the decision-making process regarding Student's educational program, substantively denied him a FAPE or deprived him of access to his education.

19

32.     The evidence established that Mother meaningfully participated in the August 2, 2012 IEP with the assistance of her legal counsel, Dr. Patterson and Ms. Biggs. The IEP team considered Mother's questions and concerns and the recommendations made by Dr. Patterson and Ms. Biggs, both of whom actively participated in the lengthy IEP meeting. The evidence also established through the credible testimony of Ms. Knitter, Mr. Lund and Mother that the IEP team agreed that Student would receive AT devices as part of his IEP. Ms. Knitter and Mr. Lund had an actual understanding during the August 2, 2012 IEP meeting, in light of Ms. Biggs' and Dr. Patterson's recommendations and their own experience working with Student, of what AT devices Student needed to access his education at Eastside during his transition to high school. Ms. Knitter met with the AT service provider at Eastside on the first day of school to insure that the devices were ordered if not immediately available.

33.     The evidence also established that District timely implemented the IEP, as amended on August 24, 2012. Notwithstanding the clerical error discussed above, beginning with the first week of school and until the time of hearing, District provided Student with a variety of AT devices, many of which Ms. Biggs recommended, including a longer cane, a classroom desktop computer with braille overlays for the keyboard, a laptop computer with NVDA and Duxbury software for home use, a USB memory stick for transport of work from home to school, a Bookport, a braille writer, an Eye Pal Solo oral reader, a Nemeth decoder for work with numbers and mathematics, and a talking calculator. District's failure to check the box "yes" in the original IEP, and specify which devices would be provided to Student in the August 24, 2012 IEP amendment, was not significant under all of the above circumstances, and did not substantively deny Student a FAPE. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 22, 24 through 26, 28 through 33.)

34.     Student also contends that District denied him a FAPE by not offering all of the AT devices recommended by Ms. Biggs. Although Ms. Biggs recommended an abacus, a talking watch and a tactile map of the campus, Mr. Lund and Ms. Knitter disagreed that those devices were essential for Student to access his education. Ms. Biggs' recommendations were based on her assessments of Student while he was in middle school in another District, and she was unfamiliar with Eastside, all of which reduced the persuasive impact of her recommendations. On the other hand, Ms. Knitter and Mr. Lund credibly testified that they had worked regularly with Student during the past school year, that Student had made progress and met some of his goals during their prior instruction, and they needed to work with Student in his high school environment to determine whether he had additional specific needs. Student did not offer any evidence that by not having an abacus, a talking watch or a tactile map of the campus he could not meaningfully access his education at Eastside. Ms. Knitter's and Mr. Lund's testimony, when weighed against that of Ms. Biggs, was more persuasive on this issue.

35.     As discussed above, under *Rowley, supra*, 458 U.S. at pp. 200, 203-204, 207, District was only required to provide Student with access to an education that is reasonably calculated to "confer some educational benefit." Here, District acted reasonably by providing Student with numerous AT devices during the first several weeks of school based

upon the knowledge it had of Student's unique needs at the time of the IEP. District also provided Student with AT services from Ms. Knitter and Mr. Lund to train Student and assist him in using the devices. Student did not meet his burden to prove by a preponderance of the evidence that District denied him a FAPE by failing to provide Student with all of the AT devices recommended by Ms. Biggs. (Factual Findings 1 through 31; Legal Conclusions 1, 3 through 22, 24 through 26, 28 through 35.)

## ORDER

All of Student's claims for relief are denied.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter. District prevailed as to all issues that were heard and decided in this case.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it. Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety days of receipt.

Dated: November 27, 2012

/s/
_____
ADRIENNE L. KRIKORIAN
Administrative Law Judge
Office of Administrative Hearings

# DECLARATION OF SERVICE

**OAH No.: 2012080375**

I, <u>Tim Dean</u>, declare as follows: I am over 18 years of age and am not a party to this action. I am employed by the Office of Administrative Hearings. My business address is 2349 Gateway Oaks Drive, Suite 200, Sacramento, CA 95833. On <u>November 27, 2012</u>, I served a copy of the following document(s) in the action entitled above:

## DECISION

to each of the person(s) named below at the addresses listed after each name by the following method(s):

*[see attached service list or]*

Christian Knox
Ruderman & Knox, LLP
1300 National Drive, Suite 120
Sacramento, CA 95834
*Via GSO, courtesy copy via fax*

Bridget Cook
Antelope Valley UHSD
44811 Sierra Highway
Lancaster, CA 93534
*Via GSO, courtesy copy via fax*

Mirani Nichols
5703 Evergem Avenue
Palmdale, CA 93552
*Via GSO*

☒ **Fax Transmission.** Based upon agreement of the parties to accept service by fax transmission, I personally transmitted the above-described document(s) to the person(s) at the fax number(s) listed above, from fax machine number **(916) 376-6319**, pursuant to Government Code section 11440.20 and California Code of Regulations, title 1, section 1008, subdivision (d).

☒ **Overnight Delivery.** I enclosed the above-described document(s) in a sealed envelope or package addressed to the person(s) at the address(es) listed above, and placed the envelope or package with overnight delivery by an overnight delivery carrier at our office's regularly utilized drop box or at a location regularly utilized for collection and overnight delivery by an authorized overnight delivery courier for our office.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed at Sacramento, California on November 27, 2012.

_____/s/_____
Tim Dean, Declarant

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Dolly Gee and the assigned discovery Magistrate Judge is Michael Wilner.

The case number on all documents filed with the Court should read as follows:

**CV13- 1452 DMG  (MRWx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[✓] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
F. Richard Ruderman (SB No. 142226)
Christian M. Knox (SB No. 171780)
Ruderman & Knox, LLP
1300 National Drive, Suite 120
Sacramento, CA 95834

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

M.C., by and through his guardian ad litem, M.N; and
M.N., Parent,

PLAINTIFF(S)

v.

ANTELOPE VALLEY UNION HIGH SCHOOL
DISTRICT

DEFENDANT(S).

CASE NUMBER

CV13-01452 DMG (MRWx)

**SUMMONS**

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Christian M. Knox_____, whose address is _1300 National Drive, Suite 120 Sacramento, CA 95834_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

MAR - 4 2013

Dated: _____

Clerk, U.S. District Court

By: _____
            Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
F. Richard Ruderman (SB No. 142226)
Christian M. Knox (SB No. 171780)
Ruderman & Knox, LLP
1300 National Drive, Suite 120
Sacramento, CA 95834

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.C., by and through his guardian ad litem, M.N; and M.N., Parent,<br><br>PLAINTIFF(S)<br><br>v.<br><br>ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV13-01452 D MG (MRWx)<br><br><br>SUMMONS |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within ___26___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Christian M. Knox_____, whose address is _1300 National Drive, Suite 120 Sacramento, CA 95834_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____MAR - 4 2013____

By: _____E. Tmmp_____

Deputy Clerk

(Seal of the Court)

1197

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                                        SUMMONS